UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CASE NO. 5:19-CV-00257-RH-MJF

MGFB PROPERTIES, INC., FLORA-
BAMA MANAGEMENT, LLC, and
FLORA-BAMA OLD S.A.L.T.S., INC.,

        Plaintiffs,

v.

VIACOMCBS INC., 495
PRODUCTIONS HOLDINGS LLC, and
495 PRODUCTIONS SERVICES LLC,

        Defendants.

 

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
PROF. DAVID FRANKLYN**



**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ...............................................................................................2

LEGAL STANDARD.........................................................................................7

ARGUMENT ...................................................................................................9

      I.     Franklyn's Confusion Survey Uses an Unprecedented Format That Does Not Reliably Test for Either Forward Confusion or Reverse Confusion.................................................11

            A.     Franklyn Surveyed the Wrong Universe to Test for Forward Confusion............................................................11

            B.     Franklyn Used the Wrong Stimulus to Test for Reverse Confusion. ..........................................................15

            C.     Franklyn's Hybrid Survey Design Does Not Reflect Marketplace Conditions........................................18

      II.    Franklyn's Screening Question Primed Respondents to Name Plaintiffs in Answers to Subsequent Questions.................21

      III.   Franklyn Used an Improper Control............................................24

      IV.   Franklyn's Coding of Survey Responses Was Neither Accurate nor Objective. ................................................26

CONCLUSION...............................................................................................29

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ........................................................................8

*Amstar Corp. v. Domino's Pizza, Inc.*,
   615 F.2d 252 (5th Cir. 1980) ......................................................................12, 13

*Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*,
   685 F. Supp. 2d 1360 (N.D. Ga. 2010).............................................................12

*CSL Silicones, Inc. v. Midsun Grp. Inc.*,
   2017 WL 6055380 (D. Conn. Dec. 7, 2017) .....................................................13

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...................................................................................1, 8

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
   2014 WL 814532 (S.D.N.Y. Mar. 3, 2014).......................................................15

*Fuel Clothing Co. v. Nike, Inc.*,
   7 F. Supp. 3d 594 (D.S.C. 2014) ......................................................................21

*Gen. Motors Corp. v. Cadillac Marine & Boat Co.*,
   226 F. Supp. 716 (W.D. Mich. 1964) ................................................................28

*Hodgdon Powder Co. v. Alliant Techsystems, Inc.*,
   512 F. Supp. 2d 1178 (D. Kan. 2007)..........................................................13, 14

*Hughes v. Kia Motors Corp.*,
   766 F.3d 1317 (11th Cir. 2014) .........................................................................8

*Innovation Ventures, LLC v. NVE, Inc.*,
   90 F. Supp. 3d 703 (E.D. Mich. 2015) ..............................................................24

*J.T. Colby & Co. v. Apple Inc.*,
   2013 WL 1903883 (S.D.N.Y. May 8, 2013) .....................................................18

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

*Joules Ltd. v. Macy's Merch. Grp. Inc.*,
  2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016)........................................12

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*,
  2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)..................................9, 22

*Kelly-Brown v. Winfrey*,
  95 F. Supp. 3d 350 (S.D.N.Y. 2015) ..........................................20, 21

*Koninklijke Philips Electronics N.V. v. Hunt Control Sys., Inc.*,
  2017 WL 3719468 (D.N.J. Aug. 29, 2017) .......................................16

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................24

*Phelan Holdings, Inc. v. Rare Hosp. Mgmt., Inc.*,
  2017 WL 1135266 (M.D. Fla. Mar. 27, 2017) ...................................13

*Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg.
  Grp., LLC*,
  2019 WL 7376782 (S.D. Fla. Sept. 26, 2019) ........................10, 18, 22

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
  354 F.3d 1020 (9th Cir. 2004) ......................................................23

*Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*,
  858 F. Supp. 1268 (S.D.N.Y. 1994) ...............................................28

*Reynolds Consumer Products Inc. v. Handi-Foil Corp.*,
  2014 WL 794277 (E.D. Va. 2014) .............................................9, 10

*Sazerac Co. v. Fetzer Vineyards, Inc.*,
  265 F. Supp. 3d 1013 (N.D. Cal. 2017)...........................................23

*Sazerac Co. v. Fetzer Vineyards, Inc.*,
  786 F. App'x 662 (9th Cir. 2019)...................................................23

*Scott Fetzer Co. v. House of Vacuums Inc.*,
  381 F.3d 477 (5th Cir. 2004) ........................................................15

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
  104 F. Supp. 2d 1033 (S.D. Ind. 2000).............................................9

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

*Skechers U.S.A., Inc. v. Vans, Inc.*,
  2007 WL 4181677 (C.D. Cal. Nov. 20, 2007) .................................................24

*Smith v. Wal-Mart Stores, Inc.*,
  537 F. Supp. 2d 1302 (N.D. Ga. 2008).................................................13

*Superior Consulting Servs., Inc. v. Shaklee Corp.*,
  2018 WL 2087239 (M.D. Fla. May 4, 2018) .............................................10, 20

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) .........................................................11, 22

*THOIP v. Walt Disney Co.*,
  788 F. Supp. 2d 168 (S.D.N.Y. 2011) .........................................................28

*United States v. Pon*,
  963 F.3d 1207 (11th Cir. 2020) ...........................................................8, 10, 11

*Valador, Inc. v. HTC Corp.*,
  242 F. Supp. 3d 448 (E.D. Va. 2017) .........................................................10, 13

*Wreal, LLC v. Amazon.com, Inc.*,
  2016 WL 8793317 (S.D. Fla. Jan. 7, 2016).........................................................15

*Wreal, LLC v. Amazon.com, Inc.*,
  2019 WL 3890320 (S.D. Fla. July 26, 2019) .............................................12, 16

**Rules**

Federal Rule of Evidence 403 ..................................................................1, 8, 9

Federal Rule of Evidence 702 ..................................................................1, 7, 8

Northern District of Florida Local Rule 7.1 ...........................................................1

**Other Authorities**

William G. Barber, *The Universe*, *in* Trademark & Deceptive
  Advertising Surveys (Shari Seidman Diamond and Jerri B. Swann
  eds., 2012).......................................................................................12, 14

Shari Seidman Diamond, *Control Foundations*, *in* Trademark &
  Deceptive Advertising Surveys (Shari Seidman Diamond and Jerri
  B. Swann eds., 2012) ...................................................................................25

v

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Shari Seidman Diamond, *Reference Guide on Survey Research*, *in*
    Reference Manual on Scientific Evidence (Federal Judicial Center,
    3d ed. 2011) ...........................................................................................27

Shari Seidman Diamond, *Surveys in Dilution Cases II*, *in* Trademark
    & Deceptive Advertising Surveys (Shari Seidman Diamond and
    Jerri B. Swann eds., 2012) .................................................................14

Kevin Lane Keller, *Strategic Brand Management: Building,
    Measuring, and Managing Brand Equity* 341 (4th ed. 2013) ...........13

J. Thomas McCarthy, McCarthy on Trademarks & Unfair
    Competition (5th ed. 2021).....................................................12, 18, 21

Itamar Simonson & Itan Kivetz, *Demand Effects in Likelihood of
    Confusion Surveys*, *in* Trademark & Deceptive Advertising
    Surveys (Shari Seidman Diamond and Jerri B. Swann eds., 2012) ...................15

vi
**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Federal Rules of Evidence 403 and 702, and Local Rule of the Northern District of Florida 7.1, Defendants ViacomCBS Inc., 495 Productions Holdings LLC, and 495 Productions Services LLC (collectively, "Defendants") have moved this Court to exclude in part the reports and expert testimony of Prof. David Franklyn and hereby submit their memorandum in support thereof.

## PRELIMINARY STATEMENT

Franklyn's confusion survey and expected testimony opining on the likelihood of confusion between Plaintiffs' food and drink establishments and Defendants' reality TV series ("*MTV Floribama Shore*" or the "Series") should be excluded, because the survey violates multiple basic principles of survey design. Franklyn claims that he attempted to test for both forward and reverse confusion in the same survey. But rather than running two different surveys, one for each type of confusion, as is the established practice, Franklyn used an unprecedented hybrid design that does not reliably test for either type of confusion. Franklyn has offered no explanation for this complete departure from accepted procedure other than the platitude that "every case is unique." Declaration of Susan J. Kohlmann in Support of Motion to Exclude Expert Testimony of Prof. David Franklyn ("Kohlmann Decl."), Ex. 1, 87:14-15, 91:16. But there is nothing so unusual about this case that justifies ignoring decades of survey case law and scholarly literature.

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Indeed, Franklyn's survey is not only unprecedented but was designed to generate "confusion" where none exists in reality.  In Franklyn's survey, responses referencing *Plaintiffs* were the indicator of confusion.  But Franklyn maximized his chances of obtaining such responses by limiting his universe of respondents to people who were familiar with Plaintiffs, and over half of whom were Plaintiffs' *actual* customers.  Then, for good measure, Franklyn "primed" his respondents to give responses referencing Plaintiffs by asking them about their relationship to Plaintiffs in an initial screening question.

Franklyn's hybrid survey is fatally flawed for all the following reasons: (1) it used the wrong survey universe to test for forward confusion, (2) it used the wrong stimulus to test for reverse confusion, (3) it failed to replicate market conditions by creating a mismatch between the universe surveyed and the stimulus used, (4) early screening questions "primed" respondents to give answers indicating confusion, (5) the survey did not have an adequate control, and (6) Franklyn's coding of responses was subjective and unreliable.  Many of these flaws are sufficient standing alone to render the survey inadmissible.  But taken together, they amount to a survey that has no reliability whatsoever and would serve only to confuse and mislead the jury.  Franklyn's confusion survey must be excluded.

## BACKGROUND

On January 22, 2021, Plaintiffs and Defendants each disclosed survey experts—Franklyn for Plaintiffs and Dr. Itamar Simonson for Defendants—to opine

2

on the likelihood of confusion between Plaintiffs' establishments and Defendants' television series. Franklyn conducted two surveys. The first (the "Confusion Survey," which Franklyn calls "Survey I") was intended to measure the likelihood of confusion in this case. The second (the "Geography Survey," which Franklyn calls "Survey II") was designed to "assess . . . the usage of Flora-Bama as a geographic descriptor for the general region that spans the state line between Florida and Alabama." Kohlmann Decl., Ex. 2, at 3.

## A.    The Confusion Survey

The following briefly summarizes the relevant features of the Confusion Survey.

*Screening Questions.* Franklyn screened the survey universe to include *only* respondents who both (1) were aware of Plaintiffs' establishment, the Flora-Bama Lounge, and (2) lived in a "qualifying" zip code. This was achieved through screening questions at the beginning of the survey. One question provided a list of nine bars or restaurants "located in the general region of the Florida Alabama border," including the Flora-Bama Lounge, and asked respondents to state for each establishment whether they had heard of it and whether they had visited. Kohlmann Decl., Ex. 2, at 20. Respondents who had never heard of the Flora-Bama Lounge were terminated from the survey. *Id.* Respondents were also asked to provide their zip code. *Id.* at 18-19. Zip codes qualified a respondent to participate only if they

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

appeared in at least ten unique entries on what Franklyn states is Plaintiffs' "mailing list." *Id.* at 19.[1]

*Test and Control Stimuli.* Qualifying respondents were sorted into either the "test" group or the "control" group. The test group was shown a promotional video for *MTV Floribama Shore.* The control group was shown a promotional video for an entirely different television show, *Ex on the Beach.*

*Confusion Questions.* Respondents were then asked four questions about the video they had just watched that were designed to test for confusion:

1. First, respondents were asked to identify the company that "makes or puts out" the television show promoted in the video. *Id.* at 14. Nearly all respondents in the test group correctly identified MTV, and responses to this question did not identify any confusion. *Id.* at 39; Kohlmann Decl., Ex. 1, 159:8-22.

2. Next, respondents were asked whether the television show "is sponsored or approved" by another company, and if so, what company. Kohlmann Decl., Ex. 2, at 14-15. This question was designed to test for forward confusion only. Kohlmann Decl., Ex. 1, 160:3-16.

3. Respondents were then asked whether the television show "sponsors or approves" another company, and if so, what company. Kohlmann Decl., Ex. 2, at 15-16. This question was designed to test for reverse confusion. Kohlmann Decl., Ex. 1, 185:2-13.

4. Finally, respondents were asked whether the television show "has a

---

[1] At his deposition, Franklyn did not appear to have a clear understanding of what the list he used represented. Kohlmann Decl., Ex. 1, 110:3-116:7. At first he claimed it was "a log of people who have visited the lounge over the years," *id.* at 111:20-21, but subsequently conceded that it appeared to be a list of people who bought tickets to events at the Flora-Bama or made purchases on Plaintiffs' online store. *Id.* at 115:9-15. Franklyn could not explain why Plaintiffs' marketing expert, Michael Albrecht, relied on an entirely different set of customer lists in concluding that Plaintiffs' customers come from all across the country. *Id.* at 116:13-117:25.

4

UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL

business affiliation or connection with" another company, and if so, what company. Kohlmann Decl., Ex. 2, at 16-17. Franklyn testified that this question was designed to test for both forward and reverse confusion. Kohlmann Decl., Ex. 1, 202:25-203:16.

Ultimately, Franklyn concludes that 22% of respondents in his test group gave at least one response indicating confusion. Kohlmann Decl., Ex. 2, at 45.

*Question about* MTV Floribama Shore. Finally, respondents were asked to "describe [their] relationship with" *MTV Floribama Shore*. *Id.* at 17. 50% of respondents in the test group indicated that they had never heard of the Series at all. Further, only 13% of respondents indicated that they had ever watched the Series, and only 6% indicated that they had watched more than once or twice. *Id.* at 44.

**B.     The Geography Survey**

Franklyn's Geography Survey used two different subsamples of respondents, each of which was constructed from a different universe from the Confusion Survey's. The first, "national" subsample consisted of adults in the United States, with no further demographic screening. The second, "regional" subsample was limited to adults who provided a zip code "within 25 miles of the border between Florida and Alabama," *id.* at 32—but not including any of the portion of the border that runs eastward toward Georgia. Kohlmann Decl., Ex. 2, Appendix B – Survey 2, at 1.

Respondents in both subsamples were shown the following map:

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**



Franklyn describes the map as "highlight[ing] the region along the Florida Alabama border," Kohlmann Decl., Ex. 2, at 27, but again, the highlighted region did not include the eastern portion of the border.  Franklyn testified that he could not recall why the rest of the border was not included.  Kohlmann Decl., Ex. 1, 225:3-13.  He further testified that he believed the highlighted region was the region most likely to be described geographically as "Flora-Bama," but could not recall the basis for that understanding.  *Id.* at 225:15-226:8.

Respondents were then asked to list "any and all names" they would use to describe the highlighted portion of the map.  Kohlmann Decl., Ex. 2, at 30.  7% of respondents in the "regional" subsample gave the response "Flora-Bama," as did 2% of respondents in the "national" subsample.  *Id.* at 47, 49.

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Given the lack of case law on the appropriate design for this type of survey, Defendants do not seek to exclude the Geography Survey.  Nevertheless, it is clear that the survey did not reliably test the extent to which "Flora-Bama" is used as a geographic descriptor.[2]  Instead, Franklyn tested whether people give the name "Flora-Bama" when asked to describe an arbitrary circular area on a map.  The survey did not, and could not, test whether more respondents might have given the name "Flora-Bama" if the highlighted region had been defined differently (by including the rest of the Florida Panhandle, for example).  With that being said, the survey *does* prove at least some use of "Flora-Bama" in a geographically descriptive sense.

## LEGAL STANDARD

Federal Rule of Evidence 702 authorizes the admission of the testimony of an expert qualified by knowledge, skill, experience, training or education, but only if: (1) the expert's specialized knowledge will help the trier of fact; *and* (2) the testimony is based on sufficient facts or data and is produced by reliable principles and methods, which the expert then reliably applied to the case.  Fed. R. Evid.

---

[2] For example, the Geography Survey also found that only 3% of "regional" respondents (and 6% of "national" respondents) called the highlighted area "Florida/Alabama Borderline," Kohlmann Decl., Ex. 2, at 47, 49, yet "Florida/Alabama Borderline" is obviously geographically descriptive.  Franklyn testified that his survey did "not suggest[] anything one way or the other" on whether "Florida/Alabama Borderline" is only rarely used as a geographic descriptor. Kohlmann Decl., Ex. 1, 228:13-19.  The same necessarily holds true for "Flora-Bama."

7

UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL

702(a)-(d).   Trial judges serve as "gatekeepers," ensuring that "speculative, unreliable expert testimony" is not admitted. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328-29 (11th Cir. 2014) (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005)).   The court's gatekeeping function is critical because an expert's testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (citation omitted).

To determine the admissibility of expert testimony, courts apply a three-part inquiry. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999). First, the expert must be qualified to testify on the matter addressed. *Id.*   Second, the expert's conclusions must be supported by reliable methodologies. *Id.*   Third, the expert's scientific, technical, or specialized knowledge must assist the trier of fact. *Id.*   The burden of satisfying all three parts of this inquiry rests with the party offering the expert. *Id.* at 1306.

Courts determine whether a theory or method is reliable based on four factors: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *United States v. Pon*, 963 F.3d 1207, 1220 (11th Cir. 2020) (citation omitted).

Additionally, under Federal Rule of Evidence 403, a court may exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Courts have excluded confusion surveys and related expert testimony under Rule 403 where the surveys were sufficiently flawed that their probative value was outweighed by the potential for the jury to be misled or confused. *See, e.g., Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688, at *12 (S.D.N.Y. Aug. 6, 2007) (collecting cases and noting that "[t]he live testimony of [plaintiff's] highly seasoned and impressively credentialed consumer confusion expert, regarding the results of [a] deeply flawed . . . [s]urvey, would prove to be both powerful and quite misleading" (citations and quotation marks omitted)); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1052 (S.D. Ind. 2000).

## ARGUMENT

Franklyn's testimony regarding likelihood of confusion must be excluded because it is based on untested and unreliable survey methodology. Franklyn used a novel hybrid survey design for which he was unable to identify any precedent in the case law or elsewhere.[3] That alone casts serious doubt on the reliability of

---

[3] At his deposition, Franklyn claimed to have relied on court decisions providing support for his methodology, but could not recall those decisions and promised to provide them to Defendants after the deposition. Kohlmann Decl., Ex. 1, 100:13-101:8, 129:10-130:10, 191:24-192:6. On Friday, April 23 (the last business day before Defendants' filing deadline), at 6 p.m., Plaintiffs' counsel emailed four case citations without further explanation. Defendants thus have not had the opportunity to ask Franklyn how those cases informed his survey design. One of those cases, *Reynolds Consumer Products Inc. v. Handi-Foil Corp.*, 2014 WL 794277 (E.D. Va. 2014), does not appear to have any relevance to Franklyn's methodology at all. No survey in that case purported to test for both forward and reverse confusion at the

9
**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Franklyn's design.  *See Pon*, 963 F.3d at 1220-21 (affirming exclusion of expert testimony based on theory that had not been tested and was not generally accepted). In addition, Franklyn's survey violates so many principles of survey design that it is devoid of probative value.  It uses the wrong survey universe to test for forward confusion and uses the wrong stimulus to test for reverse confusion.  Franklyn's confusion numbers were artificially inflated by his use of a screening question that improperly primed respondents to think of the Flora-Bama Lounge and by his use of an improper control stimulus.  Finally, Franklyn coded survey responses himself rather than relying on an independent third party, resulting in multiple errors.

Each of these flaws alone is sufficient to seriously undermine the reliability of Franklyn's survey.  Taken in combination, they require that his survey and related testimony be excluded.  *See, e.g., Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 2019 WL 7376782, at *7-8 (S.D. Fla. Sept. 26, 2019) (excluding survey due to improper questions and failure to replicate marketplace conditions); *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2018 WL 2087239, at *4 (M.D. Fla. May 4, 2018) (excluding survey for failing properly to show mark at issue and including no control); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 459 (E.D. Va. 2017) (finding survey inadmissible due to improper universe, failing

---

same time.  *Reynolds* is also factually distinguishable because it was a lawsuit between two competing manufacturers of aluminum foil.  *Id.* at *1. The other three cases are discussed *infra* at notes 8 and 11. None supports Franklyn's methodology.

10

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

to replicate marketplace conditions, and not using control group), *aff'd*, 707 F. App'x

138 (4th Cir. 2017); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 219 (S.D.N.Y.

2010) (excluding survey and noting that "[e]xclusion may be justified, however,

where a single error or the cumulative errors are so serious that the survey is

unreliable or insufficiently probative").

## I.   FRANKLYN'S CONFUSION SURVEY USES AN UNPRECEDENTED FORMAT THAT DOES NOT RELIABLY TEST FOR EITHER FORWARD CONFUSION OR REVERSE CONFUSION.

Franklyn's Confusion Survey uses a novel hybrid design with no identified

precedent in the case law or scholarly literature.  As a method that has not been

generally accepted or peer reviewed, it fails to satisfy two key criteria for reliability.

*See Pon*, 963 F.3d at 1220.  But in addition to its novelty, Franklyn's survey directly

violates fundamental principles for testing for forward and reverse confusion, as

summarized in the following chart:

|  | **Forward confusion** | **Reverse confusion** |
|---|---|---|
| **What Franklyn should have done** | Surveyed *junior user's* (here, Defendants') potential customers | Used *senior user's* (here, Plaintiffs') mark as stimulus |
| **What Franklyn did** | Surveyed *senior user's* (here, Plaintiffs') potential *and actual* customers | Used *junior user's* (here, Defendants') mark as stimulus |

The survey is thus entirely unreliable and should be excluded.

### A. Franklyn Surveyed the Wrong Universe to Test for Forward Confusion.

Franklyn surveyed a universe that is irrelevant to forward confusion: people

UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL

who are aware of Plaintiffs and live in areas where Plaintiffs' customers are located.[4]

In a forward confusion survey, the relevant survey universe is composed of potential buyers or consumers of the *junior user's* goods or services.   6 McCarthy on Trademarks & Unfair Competition § 32:159 (5th ed. 2021) ("McCarthy"); *accord Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980); *Joules Ltd. v. Macy's Merch. Grp. Inc.*, 2016 WL 4094913, at *10 (S.D.N.Y. Aug. 2, 2016); *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1373 (N.D. Ga. 2010); William G. Barber, *The Universe*, *in* Trademark & Deceptive Advertising Surveys 28-29 (Shari Seidman Diamond and Jerri B. Swann eds., 2012) ("Diamond & Swann").[5]   "The reason for this rule is clear—in cases alleging forward confusion, what is at issue is whether the junior user's mark is likely to confuse consumers.   In order to fairly test that issue, one must look at those consumers likely to encounter the junior user's mark in the marketplace." Barber, *The Universe*, *in* Diamond & Swann 29.

---

[4] Forward confusion occurs when consumers believe the junior user's products (here, Defendants' Series) come from the senior user (here, Plaintiffs).   4 McCarthy on Trademarks & Unfair Competition § 23:10 (5th ed. 2021).   Reverse confusion occurs when consumers believe the senior user's products come from the junior user. *Id.* In a reverse confusion case, "the junior user does not seek to profit from the good will associated with the senior user's mark." *Wreal, LLC v. Amazon.com, Inc.*, 2019 WL 3890320, at *9 (S.D. Fla. July 26, 2019) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992)).   Rather, the junior user "saturates the market" with its trademark, overwhelming a smaller senior user. *Id.*

[5] Franklyn recognized that Diamond & Swann's volume is "an authoritative guide to designing confusion surveys." Kohlmann Decl., Ex. 1, 95:17-96:2.

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Choosing the proper survey universe is "one of the most important factors" determining the validity of a survey. *Amstar*, 615 F.2d at 264; *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008). Accordingly, courts routinely exclude expert testimony based on surveys of the wrong universe. *See, e.g.*, *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 2017 WL 6055380, at *8 (D. Conn. Dec. 7, 2017); *Valador*, 242 F. Supp. 3d at 459-61; *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1182 (D. Kan. 2007) (excluding survey where "a biased method was used for the selection of participants—only people familiar with plaintiff were surveyed"); *cf. Phelan Holdings, Inc. v. Rare Hosp. Mgmt., Inc.*, 2017 WL 1135266, at *7 n.7 (M.D. Fla. Mar. 27, 2017) (noting that if the court had not granted summary judgment, it would have excluded survey for failing to test appropriate universe).

In this case, Defendants are the junior user. Yet Franklyn did not survey potential viewers of the Series. Instead, Franklyn screened respondents based on their awareness of *Plaintiffs* and whether they came from geographic areas from which *Plaintiffs* draw their customer base. As a result, only 13% of his universe had ever watched the Series, and half had never even heard of it.[6] And although the

---

[6] Moreover, the survey responses likely inflate the number of respondents who were actually aware of or had watched the Series, due to Franklyn's failure to control for spurious awareness. Kohlmann Decl., Ex. 4, ¶¶ 23-26. This refers to the well-established tendency of survey respondents to claim awareness of names or brands they have not in fact heard of. *See* Kevin Lane Keller, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity* 341 (4th ed. 2013); Shari

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Series has a national audience, Franklyn's screening procedures resulted in a survey population that contained *no* respondents at all from 41 states (and a sample size of one for an additional three states). Kohlmann Decl., Ex. 5.[7] Ultimately, Franklyn's universe biased the results in Plaintiffs' favor by ignoring viewers or potential viewers of the Series who are *not* aware of Plaintiffs and thus could not have been confused upon seeing the Series title. *See Hodgdon Powder*, 512 F. Supp. 2d at 1182.

Further, over half of the respondents in Franklyn's test group (136 of 250) were not only aware of the Flora-Bama Lounge but indicated that they had actually visited in the past. Kohlmann Decl., Ex. 6. "Senior users who limit a survey's universe to their own actual customers are obviously trying to rig the survey to produce a favorable result." Barber, *The Universe*, *in* Diamond & Swann 31; *see*

---

Seidman Diamond, *Surveys in Dilution Cases II*, *in* Diamond & Swann 156. One method to control for spurious awareness is to present respondents with a list of brands in the same product category, including one or more nonexistent brands as controls. Respondents who claim awareness of the controls should then be excluded from the survey. *See* Shari Seidman Diamond, *Surveys in Dilution Cases II*, *in* Diamond & Swann 156-57. Indeed, that is precisely the method Franklyn used to measure awareness of *Plaintiffs* in his screening question. Kohlmann Decl., Ex. 2, at 20. But to measure awareness of *MTV Floribama Shore*, Franklyn inexplicably used a different method and simply asked respondents whether they were aware of or had watched that particular series, without using a list of other television series or a control. *Id.* at 17; Kohlmann Decl., Ex. 1, 218:12-219:7.

[7] Franklyn did not include detailed tabulations of the responses to his survey's questions in his report and instead simply provided a spreadsheet with the raw data. Exhibits 5, 6, and 7 to the Kohlmann Declaration were prepared by Defendants based on their analysis of the data in that spreadsheet. An Excel file of the spreadsheet (titled "Appendix D - Survey 1 Data") is being provided to the Court via flash drive.

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004) (survey of universe constructed from senior user's customer lists was too flawed to create question of fact as to confusion).  The fact that over half of Franklyn's universe consisted of actual customers of Plaintiffs further undermines the reliability of the survey.

Ultimately, Franklyn purported to test for forward confusion by surveying a universe that is irrelevant to that issue.  This flaw alone is sufficient to require the exclusion of the Confusion Survey.

### B. Franklyn Used the Wrong Stimulus to Test for Reverse Confusion.

Franklyn's testimony on reverse confusion is also fatally unreliable due to his use of the wrong survey stimulus.  Reverse confusion occurs when consumers are confused about the source of the *senior user's* goods or services.  Accordingly, the appropriate survey stimulus in a test for reverse confusion is an example of the *senior user's* mark.  *See, e.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 2016 WL 8793317, at *12 (S.D. Fla. Jan. 7, 2016) ("In a reverse confusion case, the survey shows respondents an example of the senior user's mark as used in commerce . . . ."); *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, at *7, *20-22 (S.D.N.Y. Mar. 3, 2014) (approving reverse confusion survey that used image of plaintiff's product as stimulus); Itamar Simonson & Itan Kivetz, *Demand Effects in Likelihood of Confusion Surveys*, *in* Diamond & Swann 248 ("[I]n a 'reverse confusion' case, the 'senior' (allegedly infringed) mark is presented.").  A proper survey should then

15

analyze whether respondents mention the *junior user's* mark in their answers, thus testing whether the junior mark has in fact "saturated" the senior user's market—the key claim in a reverse confusion case. *Wreal, LLC v. Amazon.com, Inc.*, 2019 WL 3890320, at \*9 (S.D. Fla. July 26, 2019); *Koninklijke Philips Electronics N.V. v. Hunt Control Sys., Inc.*, 2017 WL 3719468, at \*33 (D.N.J. Aug. 29, 2017) ("[T]he point [of a reverse confusion survey] is to test whether the junior user's mark has saturated the market.").

Here, although Plaintiffs are the senior user, Franklyn did not show respondents Plaintiffs' mark. Instead, Franklyn flipped the standard reverse confusion survey format on its head by showing respondents a video of *Defendants'* show and asking them whether the producer of the show "sponsors or approves" another company. Kohlmann Decl., Ex. 2, at 15-16. This is not an accepted method to test for reverse confusion—indeed, Franklyn testified that he had never tested for reverse confusion in this way before, nor could he identify any court decision approving the method. Kohlmann Decl., Ex. 1, 192:15-193:5.

This method also biased results in Plaintiffs' favor. Under the accepted survey method, Franklyn should have shown respondents Plaintiffs' mark and tallied answers that mentioned *MTV Floribama Shore*. A large number of such answers would have been probative of reverse confusion by indicating high awareness, or saturation, of *MTV Floribama Shore* in Plaintiffs' market. Here, however, Franklyn made every respondent artificially familiar with *MTV Floribama Shore* by showing

16

<u>**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**</u>

them a video of that show.  And by testing whether respondents named *Plaintiffs* in their answers, he did not and could not test whether Defendants have saturated Plaintiffs' market.  Further, this flaw significantly impacted Franklyn's results: over half (13 of 25) of the answers to the reverse confusion question that Franklyn coded as indicating confusion came from respondents who also stated that, before taking the survey, *they had never heard of the Series.*  Kohlmann Decl., Ex. 7.  In a survey using the accepted method, none of these respondents would have given answers that indicated confusion, because they could not have named *MTV Floribama Shore.*

Franklyn testified that he did not need to use Plaintiffs' mark as a stimulus because he limited the universe to people who were aware of Plaintiffs.  Kohlmann Decl., Ex. 1, 189:12-190:11.  But the universe and the stimulus are not an either-or proposition.  Even assuming Franklyn picked the correct universe for a reverse confusion survey, accepted methods still required him to use Plaintiffs' mark as the stimulus.  The problem with Franklyn's reverse confusion survey format is that it failed to account for the significant portion of Plaintiffs' customer base (which Franklyn's own survey demonstrated to be at least 50%) that has not heard of *MTV Floribama Shore* and thus *cannot* experience reverse confusion.  Franklyn's limited survey universe did nothing to address this problem.

Moreover, Franklyn's reverse confusion and forward confusion questions were identical except for the fact that one used the active voice and the other used the passive voice.  It is unlikely that respondents parsed the questions finely enough

UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL

to understand the difference.  Indeed, a number of respondents gave confusion-coded answers to both questions, effectively stating that they believed both that the Series was sponsored by the Flora-Bama Lounge *and* that the Series sponsored the Flora-Bama Lounge.  Those responses suggest that, rather than reliably testing for forward and reverse confusion, Franklyn's questions were simply confusing.

Franklyn's reverse confusion methodology is not only unprecedented but artificially inflated his confusion estimates.  This also requires the exclusion of his survey.

### C. Franklyn's Hybrid Survey Design Does Not Reflect Marketplace Conditions.

A fundamental principle of survey design is that a survey must seek to mirror actual marketplace conditions.  *J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *20 (S.D.N.Y. May 8, 2013); McCarthy § 32:163 ("The closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."); *see Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 2019 WL 7376782, at *6 (S.D. Fla. Sept. 26, 2019) (excluding survey that "created an artificial marketplace instead of replicating actual market conditions").  For that reason, as explained above, respondents in confusion surveys are shown a mark they are likely to encounter in the real world based on the screening criteria used to define the survey universe.  In a forward confusion survey, for instance, respondents are selected from the junior

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

user's likely customers and are shown the junior user's mark. Franklyn, however, tested an artificial scenario in which Plaintiffs' likely (or actual) customers encounter *Defendants'* mark. The survey results themselves show how unlikely that scenario actually is—at least 50% of respondents had in fact never heard of the Series. By creating a mismatch between the population surveyed and the stimulus it was shown, Franklyn's survey tested a contrived situation divorced from the realities of the marketplace.

Indeed, Franklyn's survey design is artificially calibrated to produce as much confusion as possible even where none exists in reality. For a consumer to be confused, he or she must be aware both of Plaintiffs and of Defendants. But there is relatively little overlapping awareness of Plaintiffs and Defendants in the relevant population: Franklyn's survey shows that at least 50% of Plaintiffs' customers have never heard of *MTV Floribama Shore*, and conversely, as Franklyn testified, Plaintiffs likely have no more than 1-2% name recognition nationwide. Kohlmann Decl., Ex. 1, 276:19-277:1. Thus, if he had used accepted survey methods, Franklyn would likely have produced very low confusion numbers (and indeed, the forward confusion survey conducted by Simonson found 0% confusion, Kohlmann Decl., Ex. 3, ¶ 15). Instead, Franklyn created an artificial survey universe composed entirely of people who are aware both of Plaintiffs (due to Franklyn's screening procedures) and *MTV Floribama Shore* (after having been shown the stimulus video). While that might have boosted confusion numbers, it does not reflect the

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

reality of the marketplace.

Franklyn testified that his hybrid method was necessary because "this is a unique case in which there is both reverse and forward confusion going in opposite directions at the same time." Kohlmann Decl., Ex. 1, 126:21-24. But there is already an accepted survey method for such cases: running separate surveys to test for each type of confusion, using different survey universes and different stimuli. Franklyn could not identify any reason why he could not have run separate surveys in this case. *Id.* at 127:3-13. Nor was he able to identify any court decision approving his hybrid method, despite claiming that such decisions exist. *Id.* at 129:10-130:10.[8]

---

[8] Plaintiffs appear to believe that two of the four cases cited in their Friday-evening email support Franklyn's hybrid approach, but both are simply red herrings. In the first case, *Superior Consulting Services, Inc. v. Shaklee Corp.*, 2018 WL 2087239 (M.D. Fla. May 4, 2018) ("*Shaklee*"), the defendant's expert ran a conventional reverse confusion survey, not an unprecedented hybrid like Franklyn's. *See* Expert Report of Hal Poret at 7, *Shaklee* (No. 6:16-cv-2001), ECF No. 172-1 (explaining that survey universe consisted of "the senior user's prospective customers[, who] are the accepted universe for assessing likelihood of reverse confusion"); *id.* at 9 (explaining that survey questions were "modelled on reverse confusion"). The expert then opined that the survey happened also to be probative of forward confusion, for two reasons that do not apply to Franklyn's survey. First, 70.3% of respondents were also prospective customers of the junior user—the appropriate universe for testing forward confusion. *Id.* at 7, 63. By contrast, only 13% of Franklyn's respondents were viewers of the Series. Second, the survey in *Shaklee* used a "Sequential Lineup," or "Squirt," format, in which respondents are shown *both* conflicting marks and asked specifically about the relationship between the two. *Id.* at 7-8, 36-37. The *Shaklee* expert opined that in the scenario tested by a Squirt survey, the order in which the marks are presented should not matter. *Id.* at 9. Franklyn, however, did not use a Squirt format, and as explained *infra* in Part II, he had no basis to. Instead, he used only Defendants' Series as a stimulus and measured responses that referred to Plaintiffs, and thus could not test for reverse confusion.

The second case, *Kelly-Brown v. Winfrey*, 95 F. Supp. 3d 350 (S.D.N.Y. 2015)

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Franklyn also testified that in the context of this case it is sometimes difficult to determine whether a particular instance of confusion constitutes forward or reverse confusion. *Id.* at 126:17-127:1. But while that may be true—in this case as in many others—speculating about the existence of ambiguous cases does not give Franklyn free rein to ignore established rules and accepted practices. Franklyn's confusion survey uses a design that is unprecedented, violates basic principles of confusion survey reliability, and is jury-rigged to yield results favorable to Plaintiffs. It must be excluded.

## II.   FRANKLYN'S SCREENING QUESTION PRIMED RESPONDENTS TO NAME PLAINTIFFS IN ANSWERS TO SUBSEQUENT QUESTIONS.

Franklyn's survey design stacked the deck even further in Plaintiffs' favor by priming respondents to think of the Flora-Bama Lounge in an initial screening question.

It is well established that, where the parties' marks do not ordinarily appear

---

("*Kelly-Brown*"), provides even less support for Franklyn's methodology. The court in that case referred in shorthand to a single survey measuring both forward and reverse confusion. *Id.* at 362. But the expert at issue, who is Defendants' survey expert in *this* case, Itamar Simonson, actually conducted two separate surveys in accordance with the accepted practices outlined in this brief. *See* Decl. of Dr. Itamar Simonson ¶ 12, *Kelly-Brown* (No. 11-cv-7875), ECF No. 148-28 (explaining that survey respondents were assigned to either the forward confusion or the reverse confusion test groups, which were shown different stimuli). The court used similar imprecise shorthand in a third case not cited by Plaintiffs, *Fuel Clothing Co. v. Nike, Inc.*, 7 F. Supp. 3d 594, 621 (D.S.C. 2014) ("*Fuel Clothing*"). *See* Decl. & Rule 26 Report of Gerald L. Ford ¶¶ 5-7, *Fuel Clothing* (No. 3:12-00555), ECF No. 69-10 (describing results of separate forward confusion and reverse confusion surveys).

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

near each other in the marketplace, it is improper to show respondents both parties'

marks in a confusion survey.[9]  *See, e.g.*, *Pinnacle Advert. & Mktg. Grp., Inc. v.*

*Pinnacle Advert. & Mktg. Grp., LLC*, 2019 WL 7376782, at *6-7 (S.D. Fla. Sept.

26, 2019); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 235-38 (S.D.N.Y. 2010);

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688, at *7-8

(S.D.N.Y. Aug. 6, 2007) (describing "back-to-back display" of conflicting marks as

"major flaw" in methodology).  Doing so artificially inflates confusion estimates by

making respondents "artificially aware" during the survey of the mark that counts

toward confusion if referenced in response to survey questions.  *Kargo Glob.*, 2007

WL 2258688, at *8.  Courts routinely exclude surveys that show respondents both

parties' marks where the marks are not proximate in the marketplace.  *See, e.g.*,

*Pinnacle*, 2019 WL 7376782, at *7-8; *THOIP*, 690 F. Supp. 2d at 241; *Kargo Glob.*,

2007 WL 2258688, at *12.

Here, there is no marketplace proximity between Plaintiffs' services, which

are provided primarily at their physical establishments, and Defendants' Series,

which is available on linear television and various streaming and video-on-demand

platforms.  Franklyn's report provides no justification for considering the parties'

marks to be proximate.[10]  And indeed, Franklyn did *not* conduct a "Squirt" survey,

---

[9] As noted *supra* note 8, confusion surveys in which both conflicting marks are shown as stimuli are known as "Squirt" surveys.  *See generally* McCarthy § 32:174.50.

[10] To the extent Plaintiffs intend to argue that the parties' marks are proximate in the

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

which would have required him to show respondents both Plaintiffs' mark and Defendants' title as stimuli and ask questions about the relationship between the two. Franklyn's screening question, however, had precisely the same priming effect as if he had used a "Squirt" survey. Although Franklyn did not show respondents a visual depiction of Plaintiffs' mark, his screening question asked them to think about their relationship with the Flora-Bama Lounge.   When respondents later answered Franklyn's confusion questions, they were thus much more likely to have recently thought about the Flora-Bama Lounge than people encountering the Series under normal marketplace conditions.   This further inflated Franklyn's confusion totals and further undermines the reliability of his survey.[11]

---

marketplace because, under limited circumstances, certain internet searches may yield results relating to both Plaintiffs and the Series, that fact is entitled to "little weight" because "the same could be said for countless companies." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004).  Moreover, if search engine results are the basis for Franklyn's survey format, he should have used a stimulus that reflected the search engine environment.

[11] Plaintiffs may attempt to justify this flaw in Franklyn's survey by referencing the defendant's survey in *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013 (N.D. Cal. 2017), another case cited in their Friday-evening email, which used the defendant's product as the stimulus but also exposed respondents to the plaintiff's product as part of an array of 13 products at the beginning of the survey. *Id.* at 1027. They would be wrong to do so.  First, in *Sazerac* (unlike here) the parties' marks *were* proximate in the marketplace, providing some justification for a dual-stimulus survey design.  *See Sazerac Co. v. Fetzer Vineyards, Inc.*, 786 F. App'x 662, 664 (9th Cir. 2019) (affirming district court's finding that parties had "overlapping marketing channels").  Second, the expert in *Sazerac*, who again was Defendants' expert in *this* case, Itamar Simonson, testified in *Sazerac* that his methodology was "extra conservative" and "particularly favorable to plaintiffs." *Id.*  It was thus an appropriate, conservative methodology for a defendant seeking to prove a *lack* of confusion.  As used by a plaintiff's expert, however, that methodology serves no

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

## III.   FRANKLYN USED AN IMPROPER CONTROL.

Franklyn's testimony must be excluded for the additional reason that his survey used an improper control stimulus—a promotional video for the show *Ex on the Beach*—that had nothing in common with the stimulus used for the test group.

The purpose of a control is to separate out confusion caused by an infringing mark from confusion caused by other, legally irrelevant factors. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 595 (S.D.N.Y. 2007). For that reason, an appropriate control should not include the allegedly infringing mark but should otherwise be as similar as possible to the test stimulus, and the failure to use an appropriate control weighs in favor of excluding a survey. *Id.* at 595-96 (control that "had little in common with the bags at issue" was "an important factor cutting toward exclusion" of survey); *see also Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 718-19 (E.D. Mich. 2015) (excluding survey that used control with "blatantly obvious differences" from product at issue); *Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 WL 4181677, at *9 (C.D. Cal. Nov. 20, 2007) (control was "useless" where it differed significantly from allegedly infringing shoe). Moreover, the control "should not artificially direct the respondent away from indicating"

---

purpose other than to artificially increase confusion numbers. *Sazerac* thus simply confirms the bias inherent in Franklyn's methodology. Finally, the survey in *Sazerac* shared none of the Franklyn survey's other flaws: it did not seek to test both forward and reverse confusion at the same time, and it did not use the array that included the plaintiff's product to restrict the survey universe (as Franklyn's screening question did).

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

confusion.  Shari Seidman Diamond, *Control Foundations*, *in* Diamond & Swann 213.

Franklyn's control, however, shared nearly no characteristics with the *MTV Floribama Shore* promo he used as a test stimulus.[12]  Among other differences, the control video was not filmed in the United States, featured British-accented cast members and voiceovers, did not show any restaurants or bars, and was scored to fast-paced electronic music.  Due to these differences, the survey could not measure how much confusion was caused by the title *MTV Floribama Shore* and how much was caused by legally irrelevant factors such as the test video's Gulf Shore setting, the fact that it showed cast members in bars and restaurants, or its use of a famous Southern rock song on the soundtrack.  Indeed, the control video's foreign accents and apparent setting on a foreign deserted island likely directed respondents in the control group *away* from naming Plaintiffs' bars and restaurants on the Florida-Alabama border in their answers.  Under these circumstances, it is no surprise that Franklyn's control group reflected zero confusion.[13]

---

[12] Video files of the stimuli used with Franklyn's test group and control group are being provided to the Court via flash drive.  The *MTV Floribama Shore* promo used with the test group is the file named "Appendix B - Test Video."  The *Ex on the Beach* promo used with the control group is the file named "Appendix B - Control Video."

[13] In a confusion survey, the control group's confusion numbers are subtracted from the test group's to arrive at a final "net" confusion estimate.  Kohlmann Decl., Ex. 4, ¶ 22.  Thus, by artificially depressing his control group's confusion numbers, Franklyn artificially inflated his final net confusion estimate.

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

Nor is it an answer that, as Franklyn testified, it would have been difficult to create a control by scrubbing the word "Floribama" from the test video.  Kohlmann Decl., Ex. 1, 144:21-145:1.  That does not render Franklyn's control any less ineffective.  In any event, Franklyn could have avoided this problem by using static images (which can more easily be scrubbed of an allegedly infringing name) as stimuli.  Franklyn identified no concerns with using static images other than vague speculation that they would cause "dissonance" in a case involving a television series.  *Id.* at 310:5-15, 313:10-14.  The need for an adequate control easily outweighs such hypothetical concerns.

Franklyn testified that, when choosing his test stimulus, he considered several *MTV Floribama Shore* promos and chose one whose "content . . . was pertinent to the inquiries" he would be making.  *Id.* at 156:22-24.  But he chose a control stimulus with different content entirely.  That violation of basic survey design principles is yet another independent ground for excluding Franklyn's testimony.

## IV.   FRANKLYN'S CODING OF SURVEY RESPONSES WAS NEITHER ACCURATE NOR OBJECTIVE.

Finally, Franklyn's coding methodology was unreliable and further contributes to the inadmissibility of his survey.  To accurately test for confusion, responses to a survey's questions must be "coded" as either reflecting confusion or not.  "Coding of answers to open-ended questions requires a detailed set of instructions so that decision standards are clear and responses can be scored

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

consistently and accurately. Two trained coders should independently score the same responses to check for the level of consistency in classifying responses." Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on Scientific Evidence 413 (Federal Judicial Center, 3d ed. 2011). Rather than use independent coders, however, Franklyn coded the responses to his survey himself, with the help of an assistant who was familiar with the case and was also paid by Plaintiffs. Kohlmann Decl., Ex. 1, 39:6-8, 162:16-163:20. Franklyn also did not use any detailed set of coding instructions—he testified that he and his assistant simply "looked at what [respondents] said, to the best of our ability, to determine whether they were referring to the plaintiffs." *Id.* at 164:17-22. These decisions resulted in multiple instances of erroneous or biased coding that call Franklyn's results into serious question.

First, Franklyn's coding reflects at least the following obvious errors:

- One respondent, when asked which other company sponsors or approves the Series, answered "I do not know." Franklyn nevertheless coded this as a response referring to Plaintiffs. Kohlmann Decl., Ex. 2, Appendix D – Survey 1 Data, at AU227, BD227. At his deposition, Franklyn conceded that this "might have been" a mistake but added that he would have to "go back and check." Kohlmann Decl., Ex. 1, 178:4-16.

- Another person's response to the same question was "The bar in which they appear." Franklyn also coded this as a response referring to Plaintiffs, even though Plaintiffs' bar does *not* appear in the video respondents were shown. Kohlmann Decl., Ex. 2, Appendix D – Survey 1 Data, at AU253, BD253; Kohlmann Decl., Ex. 1, 180:10-20.

Other coding decisions appear to reflect a desire to increase the survey's

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

confusion estimate rather than an attempt to interpret responses objectively:

- One person's response to Franklyn's last confusion question was "Florabama shore." Franklyn coded this as a response referring to Plaintiffs simply because "Florabama" was spelled with an "a." Kohlmann Decl., Ex. 2, Appendix D – Survey 1 Data at BA203, BF203; Kohlmann Decl., Ex. 1, 210:5-10.

- Another response that simply said "florabama tourism" was also coded as referring to Plaintiffs. Kohlmann Decl., Ex. 2, Appendix D – Survey 1 Data, at AU380, BD380. At his deposition, Franklyn recognized that this could be reference to the tourism board for the area near the Florida-Alabama border, but asserted without elaboration that he didn't "think that's the best interpretation in this context." Kohlmann Decl., Ex. 1, 183:3-17.

- Finally, Franklyn appears to have coded all responses that simply said "Florabama" as referring to Plaintiffs, Kohlmann Decl., Ex. 1, 181:20-23, even though they could have been referencing a geographic region or simply the (misspelled) title of the Series. Kohlmann Decl., Ex. 2, Appendix D – Survey 1 Data, at AU340, BD340.

Because of Franklyn's lack of a reliable coding methodology, his confusion totals are devoid of probative value. *See THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 182 (S.D.N.Y. 2011) (excluding survey due in part to improper coding); *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (survey "entitled to no weight" due in part to subjective coding of responses); *Gen. Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F. Supp. 716, 736, 738 (W.D. Mich. 1964) (survey fell "far short of evidence of sufficient probative value" due in part to inaccurate "tabulations" of ambiguous responses). This is an additional independent ground requiring the exclusion of Franklyn's testimony.

28

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude Franklyn's testimony concerning the likelihood of confusion in this case.

Date:   April 26, 2021

By:   /s/ Susan J. Kohlmann

Susan J. Kohlmann (*Pro Hac Vice*)
Alison I. Stein (*Pro Hac Vice*)
Rémi J.D. Jaffré (*Pro Hac Vice*)
Jacob L. Tracer (*Pro Hac Vice*)
JENNER & BLOCK LLP
919 Third Avenue, 38th Floor
New York, NY 10022
Tel:  (212) 891-1600
Fax: (212) 891-1699
skohlmann@jenner.com
astein@jenner.com
rjaffre@jenner.com
jtracer@jenner.com

Robert W. Pass (FL Bar #183169)
CARLTON FIELDS, P.A.
215 South Monroe Street, Suite 500
Tallahassee, FL 32301
Tel:  (850) 224-1585
Fax: (850) 222-0398
rpass@carltonfields.com

*Counsel for Defendants*

29
**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**

## CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL RULE 7.1

Pursuant to N.D. Fla. Local Rule 7.1, I hereby certify that this Memorandum of Law is in compliance with the Court's word limit.   According to the word processing program used to prepare this motion, the total number of words in the motion, inclusive of headings, footnotes, and quotations, and exclusive of the case style, signature block, and any certificate of service is 7,647.

Date:   April 26, 2021          By:   /s/ Susan J. Kohlmann
                                      Susan J. Kohlmann (*Pro Hac Vice*)
                                      JENNER & BLOCK LLP
                                      919 Third Avenue, 38th Floor
                                      New York, NY 10022
                                      Tel:  (212) 891-1600
                                      Fax: (212) 891-1699
                                      skohlmann@jenner.com

## CERTIFICATE OF SERVICE

I certify that on April 26, 2021, I filed the foregoing provisionally under seal and served electronic copies to all counsel of record pursuant to an agreement among the parties.

Date:   April 26, 2021          By:   /s/ Susan J. Kohlmann
                                      Susan J. Kohlmann (*Pro Hac Vice*)
                                      JENNER & BLOCK LLP
                                      919 Third Avenue, 38th Floor
                                      New York, NY 10022
                                      Tel:  (212) 891-1600
                                      Fax: (212) 891-1699
                                      skohlmann@jenner.com

**UNREDACTED VERSION FILED PROVISIONALLY UNDER SEAL**