IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MGFB PROPERTIES, INC.,
FLORA-BAMA MANAGEMENT, LLC, and
FLORA-BAMA OLD S.A.L.T.S., INC.,

   Plaintiffs,

v.         CASE NO.  5:19cv257-RH-MJF

VIACOMCBS INC.,
495 PRODUCTIONS HOLDINGS LLC, and
495 PRODUCTIONS SERVICES, LLC,

   Defendants.

_____/


## ORDER GRANTING SUMMARY JUDGMENT


   This case arises at the intersection of the Lanham Act, which protects

trademarks, and the First Amendment, which protects, among other things, artistic

works that, in other contexts, would infringe trademarks. More specifically, the

contest is between the owners of the regionally famous *Flora-Bama* lounge and

entertainment complex and the later-created, nationally broadcast television series

*MTV Floribama Shore*. A now well-established line of cases holds that the Lanham

Act must be applied narrowly to artistic works to avoid conflict with First

Amendment interests. Relying primarily on this line of cases, the defendants have moved for summary judgment.

The issue is close and not squarely controlled by prior decisions. This order grants summary judgment because the plaintiffs' showing of likelihood of confusion—an element of the plaintiffs' infringement claims—is not strong enough to meet the standard that applies to artistic works. This is so in part because the plaintiffs and defendants use the competing marks in substantially different settings.

## I.  This Action

The plaintiffs are MGFB Properties, Inc., Flora-Bama Management, LLC, and Flora-Bama Old S.A.L.T.S., Inc. The plaintiffs own the registered trademark *Flora-Bama* as well as the establishment where that term was first used—a waterfront bar that has become a substantial entertainment complex.

The defendants are ViacomCBS Inc., 495 Productions Holdings LLC, and 495 Productions Services LLC. The defendants develop, produce, and distribute the television series *MTV Floribama Shore*.

The plaintiffs assert claims for trademark infringement under Lanham Act § 32 (count 1), unfair competition under Lanham Act § 43(a), trademark infringement under Florida Statutes § 495.131 (count 3), violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.204 (count 4),

trademark dilution under Florida Statutes § 495.151 (count 5), Florida common-law trademark infringement (count 6), and Florida common-law unfair competition (count 7).

After the close of discovery, the defendants moved for summary judgment. The motion has been fully briefed, orally argued, and is ripe for a decision.

## II. Summary-Judgment Standard

On a summary-judgment motion, disputes in the evidence must be resolved, and all reasonable inferences from the evidence must be drawn, in favor of the nonmoving party. This order sets out the facts that way. To prevail, the moving party must show that, when the facts are so viewed, the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A summary-judgment motion cannot be used to resolve in the moving party's favor a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

## III. Facts

The *Flora-Bama* opened as a waterfront bar in 1964. Located on the Gulf of Mexico at the state line between Florida and Alabama, the *Flora-Bama* became regionally famous and expanded to include a concert venue and other facilities. The highlight was perhaps a show that CMT broadcast nationwide in 2014, *Kenny Chesney: Live from the Flora-Bama*. Mr. Chesney performed his song *Flora-Bama*

during that year's *Flora-Bama Jama*, an event said to have attracted 40,000 patrons. The summary-judgment record gives no reason to believe the name *Flora-Bama* was anything other than a portmanteau first created by the bar's proprietors from the names of the states on whose border the bar sat.

ViacomCBS Inc. is a global media and entertainment company whose networks include MTV. Beginning in 2009, the network aired *Jersey Shore*, a reality show about 20-somethings set in a beach house in New Jersey. The series became popular and spawned iterations in other locations. The seventh premiered in 2017 and was set in Panama City Beach, Florida, roughly 100 miles east of the *Flora-Bama*. ViacomCBS entitled the Panama City Beach show *MTV Floribama Shore*.

The parties have jousted about the spelling of *Flora-Bama* and *Floribama* and whether the difference makes a difference. At least for summary-judgment purposes, the answer is, "not much." This order uses *Flora-Bama* when explicitly referring to the plaintiffs' establishment and mark, *Floribama* when explicitly referring to the defendants' show, and "FloriBama" when using the term hypothetically or generically—for example, as a possible reference to a geographic area.

The New Jersey coast has long been known as the "Jersey shore." When MTV named the show that was set there, it adopted a well-known term for the

location. The same was not true when MTV named the Panama City Beach show. Neither that area nor any other had ever been known as the Floribama shore. Indeed, aside from plaintiffs' mark *Flora-Bama* and a few apparently infringing marks that the plaintiffs diligently attempted to shut down, "FloriBama" was not a thing.

At least some of the individuals involved in selecting a name for the new show were familiar with the *Flora-Bama*. That was where the idea for the name *Floribama Shore* came from. While the name was under consideration, one of the defendants' executives googled the term and repeatedly came up only with references to the *Flora-Bama*; the executive found no use of the term to refer to the geographic area. The record gives no reason to believe that, had there been no *Flora-Bama*, the defendants would have come up with the name *Floribama Shore* on their own.

This does not mean, however, that the defendants intended to benefit from the plaintiffs' goodwill. The defendants believed the name *Floribama Shore* was superior on its own merit to such alternatives as "Florida Shore" or "Gulf Shore." The show, after all, would feature the perceived culture on a Florida panhandle beach—a culture that was a closer match to Alabama than to many places on the Florida coast or Gulf of Mexico, including, for example, those in south Florida. "Floribama" fit.

IV. The *Rogers* Two-Part Test and the Exception

To prevail on an infringement claim, the senior user of a trademark must show likelihood of confusion. The plaintiffs' showing here, while not strong, would be sufficient to withstand summary judgment in an ordinary case—a case not involving a junior user's artistic expression.

But the standard is more exacting when a junior user's artistic expression is in the mix. The watershed case is *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). There, Ginger Rogers, who famously performed with Fred Astaire, asserted a Lanham Act claim against the producers of a film entitled "Ginger and Fred." The film told the story of fictional Italian cabaret performers who imitated Ms. Rogers and Mr. Astaire and came to be known in Italy as Ginger and Fred.

The district court granted summary judgment for the defendants on the ground that the First Amendment provided absolute protection for the film's title. The Second Circuit disagreed with that view. But the court nonetheless affirmed the summary judgment for the defendants.

The animating principle was this: "Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict." *Id*. at 998. The court adopted this standard:

> We believe that in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding

> consumer confusion outweighs the public interest in free
> expression. In the context of allegedly misleading titles using a
> celebrity's name, that balance will normally not support
> application of the Act unless the title has no artistic relevance to
> the underlying work whatsoever, or, if it has some artistic
> relevance, unless the title explicitly misleads as to the source or the
> content of the work.

*Id*. at 999. The court added footnote 5 at the end of the quoted standard:

> This limiting construction would not apply to misleading titles that
> are confusingly similar to other titles. The public interest in sparing
> consumers this type of confusion outweighs the slight public
> interest in permitting authors to use such titles.

*Id*. at 999 n.5.

The first of these quoted passages—the one from the text—establishes a two-part test. In cases governed by the test, the senior user can prevail only if the junior use (1) has no artistic relevance to the underlying work or (2) explicitly misleads as to the source or content of the work. The footnote provides an exception: the two-part test does not apply to a junior user's title that is misleading and confusingly similar to a senior user's title.

To understand the *Rogers* two-part test, the footnoted exception, and their evolution in later cases, it is important to consider the nature of the senior use and, separately, the nature of the junior use. *Rogers* itself articulates the two-part test as applicable "[i]n the context of allegedly misleading titles using a celebrity's name," that is, when the senior use is a celebrity's name and the junior use

involves a title. And the *Rogers* exception, by its terms, applies when the senior and junior uses both involve titles.

*Rogers* left a gap in its coverage: it did not address senior uses other than a celebrity's identity or in titles, and it did not address junior uses except in allegedly infringing titles. Even so, the junior use in *Rogers* was not just in the show's title; references to Ginger and Fred permeated the show itself and the show's marketing materials. So the holding of *Rogers*, if not its language, applies to the junior use of a mark within a work's content and in its marketing materials, at least when the mark is also used in the title.

Other courts soon began following *Rogers* and filling in the gaps. Thus, for example, in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), the senior use was the famous "Barbie" doll, and the junior use was a song entitled "Barbie Girl" that lampooned the doll. The court explicitly adopted the *Rogers* two-part test. This extended the test to a senior use on a commercial product—a senior use that was not a celebrity's name.

In *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008), the senior user operated a strip club named "Play Pen Gentlemen's Club." The junior user created a video game with a noninfringing title but with content that included a strip club named "Pig Pen" set in the same part of Los Angeles as the Play Pen. The Ninth Circuit, which had already adopted the *Rogers*

two-part test in *Mattel*, applied it again, affirming summary judgment for the

defendants. This extended *Rogers* to a junior use that did not include an allegedly

infringing title.

In *University of Alabama Board of Trustees v. New Life Art, Inc.*, 683 F.3d

1266 (11th Cir. 2012), the senior use was the University of Alabama football

uniform. The junior use was artwork showing University of Alabama football

scenes, complete with realistic portrayals of the trademarked uniform. The

Eleventh Circuit adopted the *Rogers* two-part test and, in doing so, extended the

test to a senior use that was not a celebrity's identity and to a junior use that did not

involve a title. Indeed, in quoting the two-part test, the Eleventh Circuit entirely

omitted the *Rogers* statement that the test applied "[i]n the context of allegedly

misleading titles using a celebrity's name." Thus the Eleventh Circuit said:

> An artistically expressive use of a trademark will not violate the
> Lanham Act "unless the use of the mark has no artistic relevance to
> the underlying work whatsoever, or, if it has some artistic
> relevance, unless it explicitly misleads as to the source or the
> content of the work."

*Univ. of Ala.*, 683 F.3d at 1278 (quoting *ESS Entm't*, 547 F.3d at 1099, and citing

*Rogers*, 875 F.2d at 999).

The Eleventh Circuit had no occasion to address the *Rogers* footnote. The

law of the circuit is thus partially settled and partially unsettled. It is settled that the

*Rogers* two-part test applies to cases in which the junior use is an artistic work. It is

unsettled whether there is an exception for misleading titles that are confusingly similar to other titles.

The defendants say the *Rogers* exception has been explicitly disapproved and is not good law. The defendants thus say the *Rogers* two-part test applies just as strictly when the senior and junior uses are titles as in other contexts. That may be true in the Ninth Circuit, but it is not true in the Second. The better view is that of the Second.

In *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 494-95 (2d Cir. 1989), the senior use was on a well-known series of study guides entitled "Cliffs Notes." The junior use was "Spy Notes," a parody of Cliffs Notes and other works. The cover of Spy Notes included trademarked elements of Cliffs Notes covers. The district court enjoined the junior use, but the Second Circuit reversed, citing *Rogers* and holding that First Amendment interests required a narrow application of the Lanham Act in these circumstances.

Like the plaintiffs in the case at bar, the *Cliffs Notes* plaintiff asserted the *Rogers* footnote rendered the two-part test inapplicable. The Second Circuit implicitly agreed—or at least did not disagree. The court did not apply the two-part test. But the court said, in effect, that the applicability of the footnote—that is, the inapplicability of the two-part test—did not render *the First Amendment* irrelevant or support application of the same likelihood-of-confusion analysis applicable to a

can of peas. Instead, the court said the *Rogers* animating principle—that the

Lanham Act must be construed narrowly for artistic works to avoid trenching upon

First Amendment interests—still applies to titles:

> We believe that the overall balancing approach of *Rogers* and its
> emphasis on construing the Lanham Act "narrowly" when First
> Amendment values are involved are both relevant in this case. That
> is to say, in deciding the reach of the Lanham Act in any case
> where an expressive work is alleged to infringe a trademark, it is
> appropriate to weigh the public interest in free expression against
> the public interest in avoiding consumer confusion.

*Cliffs Notes*, 886 F.2d at 494 (citing *Rogers*, 875 F.2d at 998-99).

The Second Circuit took a substantively equivalent approach in *Twin Peaks*

*Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366 (2d. Cir.

1993). There the senior use was the popular television show "Twin Peaks" and the

junior use was a book entitled "Welcome to Twin Peaks: A Complete Guide to

Who's Who and What's What." The district court held the junior use infringing,

but the Second Circuit vacated the ruling and remanded for further consideration of

whether the likelihood of confusion was strong enough to overcome the First

Amendment interests—that is, for application of the *Cliffs Notes* balancing

approach.

To be sure, in *Twin Peaks* the Second Circuit began its analysis of this issue

by quoting the *Rogers* two-part test: "we have held that literary titles do not violate

the Lanham Act 'unless the title has no artistic relevance to the underlying work

whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.' " 996 F.2d at 1379 (quoting *Rogers*, 875 F.2d at 999). The court omitted the *Rogers* footnote—acknowledging it only by including a parenthetical, "footnote omitted." *Id.* But immediately after quoting the *Rogers* two-part test, the court quoted *Cliffs Notes*: "[T]he *Rogers* balancing approach is generally applicable to Lanham Act claims against works of artistic expression." *Id.* at 1379 (quoting *Cliffs Notes*, 886 F.2d at 495) (bracketing in original). Going forward, the court omitted "explicitly" from its discussion of the *Rogers* two-part test and instead followed *Cliffs Notes*: "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*." *Id.*

In *University of Alabama*, the Eleventh Circuit cited *Cliffs Notes* with approval, including for two propositions: first, that *Rogers* is generally applicable to works of artistic expression; and second, that "when deciding whether an artistically expressive work infringes a trademark," a court must "carefully 'weigh the public interest in free expression against the public interest in avoiding consumer confusion.' " *Univ. of Ala.*, 683 F.3d at 1278 (quoting *Cliffs Notes*, 886 F.2d at 494). Although the Eleventh Circuit did not explicitly address the *Rogers* footnote or *Cliffs Notes'* treatment of it, the overall tenor of the decision lines up perfectly with the Second Circuit's analysis in both *Rogers* and *Cliffs Notes*.

In support of their contrary view—for their assertion that the *Rogers* footnote is a dead letter and that the two-part test applies inflexibly to every case in which the junior use is artistic expression—the defendants rely on *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192 (9th Cir. 2017). There the senior use was a well-known and respected record label, "Empire Distribution." The junior use was a network television series entitled "Empire." The series portrayed a fictional music label, "Empire Enterprises." The Ninth Circuit applied the *Rogers* two-part test, explicitly rejected the plaintiff's reliance on the *Rogers* footnote, and held the junior use noninfringing.

The court's language was as broad as asserted by the defendants in the case at bar. The court said, in effect, that the *Rogers* two-part test always applies when the junior use is an artistic work—that there is no exception as asserted in the *Rogers* footnote. On that view, an artistically relevant title violates the Lanham Act only if it *explicitly* misleads as to the source or content of the work. If that were indeed the law, and if "explicitly" were construed as strictly as the defendants say it should be, then the defendants would easily prevail on the Lanham Act claims in the case at bar.

It is not entirely clear that this is indeed the law even in the Ninth Circuit. *See Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 271 (9th Cir. 2018) (construing "explicitly" to include at least some uses of identical language in an allegedly

infringing artistic work without any other misleading statement as to the source or content of the work).

In any event, the *Empire* court's analysis of the *Rogers* footnote was flawed. The court said, apparently correctly, that the footnote had been cited in only one appellate decision, *Cliffs Notes*. But the court said incorrectly that in *Cliffs Notes*, "the Second Circuit itself rejected [the footnote's] applicability and applied the *Rogers* test." *Empire*, 875 F.3d at 1197. In fact, in *Cliffs Notes* the court did not apply the two-part *Rogers* test because the footnoted exception made the two-part test inapplicable. But the court still applied the *Rogers* animating principle: when the junior use is artistic expression, the public interest in avoiding confusion must be balanced against the public interest in free expression. In the critical passage, the Second Circuit said the *Rogers* footnote:

> says only that where a title is complained about because it is
> confusingly similar to another title, the *Rogers* rule that titles are
> subject to the Lanham Act's false advertising prohibition only if
> explicitly misleading is inapplicable. But that does not mean, as
> appellee appears to claim, that nothing in the *Rogers* opinion is
> relevant to this case.

*Cliffs Notes*, 886 F.2d at 494. The court thus applied a balancing approach that took account of the interests on both sides.

This order adopts the analysis of *Rogers* and *Cliffs Notes*, both cited with approval in *University of Alabama*, and rejects *Empire*'s rejection of the *Rogers* footnote. *Cliffs Notes* adopts the proper treatment of that footnote. As *University of*

*Alabama* explicitly and repeatedly notes, in applying the Lanham Act to a junior use involving artistic expression, a court must balance the interest in trademark protection against the First Amendment interest in free expression. *See, e.g.*, *Univ. of Ala.*, 683 F.3d at 1277, 1278, 1282.

In sum, the *Rogers* two-part test applies generally to cases in which the junior use is an artistic work. But there is an exception: the test does not apply to "misleading titles that are confusingly similar to other titles." *Rogers*, 875 F.2d at 999 n.5. For cases within the exception, the two-part test does not apply, but the First Amendment remains relevant: a court still must balance the interest in trademark protection against the interest in free expression. The nature of the senior and junior uses matters. A plaintiff must make a stronger showing of likely confusion than would be required in a case not involving artistic expression.

V. Applying *Rogers*

The *Rogers* exception applies to misleading titles that are confusingly similar to other titles. The plaintiffs' use of its mark *Flora-Bama* relates primarily to its facility, not to the title of an artistic work. But the mark has occasionally been used in the title to artistic works, and in any event, artistic works are performed at the *Flora-Bama*. So the exception applies to the plaintiffs' claims, at least to the extent the defendants' title *MTV Floribama Shore* could be found misleading and

confusingly similar to the plaintiffs' titles. This requires balancing of the likelihood of confusion against the First Amendment interest in the defendants' artistic work.

In assessing likelihood of confusion, a court properly considers

> (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat, Univ.*, 830 F.3d 1242, 1255 (11th Cir. 2016). Here, as in many cases, the factors do not all cut in the same direction.

On the first factor—strength of the plaintiffs' mark—the plaintiffs emphasize that the mark is incontestable. This counts for more in the Eleventh Circuit than in most others. *See Sovereign Mil. Hospitaller Ord. of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, The Ecumenical Ord.*, 809 F.3d 1171, 1183 (11th Cir. 2015). More important is the nature of the mark itself. In one sense the mark is geographically descriptive—a portmanteau of the names of the two states on whose border the plaintiffs' establishment sits. But the term Flora-Bama was apparently created long ago specifically for this use. For most of those familiar with the term at all, it meant just one thing—the *Flora-*

*Bama*—or at least did before the defendants introduced their show. Strength of the mark cuts in the plaintiffs' favor.

The second factor—similarity of the marks—cuts both ways. The words Flora-Bama and Floribama are pronounced identically. This cuts strongly in the plaintiffs' favor. On the other side, the spelling is slightly different, the defendants always add "Shore" after "Floribama," and they usually insert "MTV" before "Floribama." This counts for something. More importantly, aside from the words, the marks are not similar at all. The graphics are wholly distinct. This cuts substantially in the defendants' favor.

The third factor—similarity of the parties' goods and services—cuts strongly in favor of the defendants. An oyster bar, lounge, and concert venue, even with an occasional festival or song or show, is nothing like a national television series.

The same is true of the fourth factor—similarity of the parties' trade channels and customers. With possible minor exceptions, the parties do not use the same trade channels. And while their targeted customers overlap, the parties are not marketing products that compete with one another; a customer does not choose between alternatives offered by the opposing parties. This again cuts strongly in the defendants' favor.

The fifth factor—similarity of advertising media used by the parties—favors the defendants but moves the needle only a little.

The sixth factor—intent to misappropriate the plaintiffs' goodwill—is neutral; the factor does not favor the plaintiffs. To be sure, the defendants copied the plaintiffs' name, and copying a name often shows an intent to misappropriate goodwill. But here the defendants have offered a convincing explanation for choosing the name on the merits, unrelated to the plaintiffs' goodwill. While not previously used for the purpose, the term "Floribama" well describes the geographic area hosting the culture depicted on the defendants' show. And *Floribama Shore* follows the pattern set by *Jersey Shore*, the first show in the series. The defendants' target market—a national television audience—far exceeds the reach of the plaintiffs' goodwill. There is no reason to believe the defendants adopted *Floribama Shore* for their national television series based not on the title's own merit but to trade on the *Flora-Bama*'s regional popularity. The record does not show that the defendants intended to pirate the plaintiffs' goodwill.

Finally, the seventh factor—the existence and extent of actual confusion in the consuming public—is neutral; the factor does not favor the plaintiffs. To be sure, the record includes the plaintiffs' poorly constructed surveys and some evidence of confusion, primarily in social media. But the evidence is scant, and most of it is ambiguous. Thus, for example, a social-media user's misspelling of "Floribama" in a post about the defendants' show hardly indicates confusion with the *Flora-Bama*. Social media abound with misspellings and grammatical errors,

and it is unlikely many English majors post comments about the defendants' show. Similarly, a customer of the *Flora-Bama* who casually inquires about any connection with *Floribama Shore* may suspect there is a connection, or may suspect there is none, or may simply be making small talk. The record includes no evidence that any individual ever decided to watch—or not to watch—*Floribama Shore* because the individual believed the show was related to or endorsed by the *Flora-Bama*. And the record includes no evidence that any individual ever decided to go—or not to go—to the *Flora-Bama* because the individual believed it was related to or endorsed by *Floribama Shore*. The same is true of the parties' collateral products, including the plaintiffs' shows and licensed song.

In sum, the plaintiffs' showing on the seven likelihood-of-confusion factors is weak. Even so, the showing would be sufficient to withstand summary judgment, were it not for the necessity to balance the showing against First Amendment interests. As the Second Circuit said in *Cliffs Notes*, the First Amendment interest is stronger when "expression, and not commercial exploitation of another's trademark, is the primary intent." *Cliffs Notes*, 886 F.2d at 495. Here the defendants' primary intent was expression—conveying to the audience the subject of the television series—not exploiting the plaintiffs' mark.

In weighing the First Amendment interest, a critical factor is the substantial disparity in how the plaintiffs and defendants use their marks. Both are in the

entertainment business. But the plaintiffs operate primarily at a single location with limited distribution of shows; much of their business is the sale of food and drink. The defendants, in contrast, have a nationally broadcast television series.

The defendants have never depicted or even referred to the plaintiffs' facility on the show. The graphic displays of the two marks are entirely dissimilar. Aside from their show's title, the defendants have done nothing that comes close to trademark infringement.

It has been said broadly that "consumers are less likely to mistake the use of someone else's mark in an expressive work for a sign of association, authorship, or endorsement." *Empire*, 875 F.3d at 1196. One need not embrace that as a universal principle to recognize that it is true when, as here, marks are used in wholly dissimilar contexts.

At bottom, most potential viewers in the national audience surely understand the title *MTV Floribama Shore* to denote another show in the *Jersey Shore* line, this one set in the geographic area suggested by the title. This is so even though the term FloriBama has not been used historically to describe that area. Most potential viewers are unlikely to believe *MTV Floribama Shore* is associated with the *Flora-Bama*, if they have heard of the *Flora-Bama* at all. The balance mandated by *Rogers*, *Cliffs Notes*, and, of controlling importance here, *University of Alabama*

compels the conclusion that the defendants' use of *Floribama Shore* in the title of their show and attendant marketing materials does not infringe the plaintiffs' mark.

The result is the same for the small amount of consumer products Viacom CBS has sold using the *Floribama Shore* name. The defendants say this resulted in $99 in revenue. When *Rogers* and its progeny protect use of a mark in the title of an artistic work, the same ordinarily is true for the sale of consumer products that display the title and are otherwise noninfringing. *See, e.g.*, *Empire*, 875 F.3d at 1196-97.

The defendants are entitled to summary judgment on counts 1 and 2 of the complaint, the Lanham Act claims.

## VI. State-Law Claims

*Rogers* and its progeny construe the Lanham Act to avoid conflict with the First Amendment. The construction is not binding on Florida courts applying Florida law, but the First Amendment *is* binding. And Florida courts have generally adopted the same trademark principles as federal courts applying the Lanham Act, albeit without confronting the *Rogers* issue. *See, e.g.*, *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652-53 (11th Cir. 2007). It is likely the Florida Supreme Court, whose construction of Florida law is controlling, would follow *Rogers*, *Cliffs Notes*, and *University of Alabama*, if the issue was presented there.

This is fatal to all the state-law claims. Count 3 of the complaint asserts a statutory infringement claim under Florida Statutes § 495.131. Count 6 asserts a common-law infringement claim, and count 7 asserts a common-law unfair-competition claim. Count 4 asserts a claim under the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.204, but the plaintiffs have asserted no basis for the claim other than the alleged infringement of their trademark. So all of these counts track the Lanham Act claims. The result is the same: summary judgment for the defendants.

Count 5 asserts a dilution claim under Florida Statutes § 495.151. Although not dependent on likelihood of confusion, the dilution claim implicates First Amendment interests, just as the infringement claims do. *See Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 44 (2d Cir. 1994) (citing *Rogers* and noting that the risk that a mark will be diluted "is generally tolerated in the interest of maintaining broad opportunities for expression"). On the facts of the case at bar, *Rogers* and its progeny are fatal to the dilution claim. *See AM General LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 486 (S.D.N.Y. 2020) (applying the *Rogers* balancing test to federal and state dilution claims).

The defendants also assert alternative grounds for summary judgment on the dilution claim.

First, by its terms, the Florida dilution statute has an exclusion for

"[n]oncommercial use of the mark." Fla. Stat. § 495.151(3)(b). This tracks the

Lanham Act, whose dilution provision also has an exclusion for any

"noncommercial use of a mark." 15 U.S.C. § 1125(c)(3)(C). The defendants assert

that use of a mark in an artistic work is always noncommercial. There is at least

some support for that view. *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894,

905-07 (9th Cir. 2002). But the cases on which the defendants rely are different.

*MTV Floribama Shore* does not lampoon the senior user's iconic mark, as in

*Mattel*, is not a documentary, as in *Jackson v. Netflix, Inc.*, 506 F. Supp. 3d 1007,

1014 n.3 (C.D. Cal. 2020), and is not speech intended primarily to express a

viewpoint, as in *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1339 (N.D.

Ga. 2008). Whether the statutory exclusion for noncommercial use applies to *MTV

Floribama Shore* is unsettled. This order does not resolve the issue.

Second, the plaintiffs have failed to present evidence from which a jury

could find that the *Flora-Bama* mark is famous throughout Florida rather than only

in the *Flora-Bama*'s geographic area. The plaintiffs concede that statewide fame is

an element of their dilution claim. *See Holding Co. of the Villages, Inc. v. Little

John's Movers & Storage, Inc.*, No. 5:17-CV-187-OC-34PRL, 2017 WL 6319549,

at *4 (M.D. Fla. Dec. 11, 2017) (dismissing a complaint for failing to sufficiently

allege the Villages was famous statewide: "Although under federal law, a plaintiff

must allege that the mark is famous among the general consuming public

nationally, under the Florida Anti–Dilution Act, a plaintiff must allege only that

the mark is famous in Florida.") (quotations omitted). The plaintiffs have spent

large sums on advertising, but the record does not show how much, if any, has

been spent in, for example, the lower half of the state, where most of the state's

residents live. Isolated shows have been distributed nationwide, and Mr. Chesney's

song is available wherever music is sold. Again, though, the record includes

nothing showing that this has resulted in the kind of fame throughout Florida that

is essential to a dilution claim.

The plaintiffs would have the burden of proof on the statewide-fame issue at

trial. The plaintiffs thus were required to present evidence in opposition to

summary judgment that, if admitted at trial and credited by the jury, would be

sufficient to carry the burden. This the plaintiffs failed to do. This is an alternative

basis for summary judgment on the dilution claim.

In sum, the defendants are entitled to summary judgment on all the state-law

claims.

VII. Conclusion

Trademark protection under federal and state law, when properly construed

in light of the First Amendment, does not reach the defendants' use of the mark

*MTV Floribama Shore* as the title of their television series. This is so despite the

mark's similarity to the plaintiffs' original but geographically descriptive mark *Flora-Bama*. For these reasons,

IT IS ORDERED:

1. The defendants' summary-judgment motion, ECF No. 86, is granted.

2. The clerk must enter judgment stating, "This case was resolved by summary judgment. All claims of the plaintiffs MGFB Properties, Inc., Flora-Bama Management, LLC, and Flora-Bama Old S.A.L.T.S., Inc. against the defendants ViacomCBS Inc., 495 Productions Holdings LLC, and 495 Productions Services LLC are dismissed with prejudice on the merits."

3. All other pending motions are denied as moot.

4. The clerk must close the file.

SO ORDERED on September 22, 2021.

s/Robert L. Hinkle
United States District Judge